FITZPATRICK et al. v. WEBER, Appellant.

Division One, May 21, 1902.

1. **Deed of Gift:** UNDUE INFLUENCE. The grantor was a widow about seventy years of age, and the grantees to whom she deeded a vested remainder, reserving a life estate to herself, were a widowed daughter who lived with her, and a dissipated son. Another son, father of plaintiffs, was a plumber and gave to her nearly all his wages until about the time of his marriage. She was very fond of his children, especially his son, and frequently said that his interest in her estate would be sufficient for his education, in which she was greatly interested. She was infirm and sick for sometime before and after this son's death; she had rheumatism and was feeble; she was prostrated by the sickness and death of this son, and had a fainting or rigid spell at the time of the funeral. which was a third spell of the kind; she was unable to attend the burial and was sick, and was attended by the widow of such son to within three days of the date on which she made the deed, and although she was then grieving very much on account of his death, and although he had been very poor, she left his children nothing. *Held*, that all this does not even tend to show that any undue influence was exercised over her by her daughter or any one else.

2. **Equity Cases:** APPELLATE PRACTICE: FINDING OF FACTS: DEED OF GIFT: UNDUE INFLUENCE. The statute (sec. 695, R. S. 1899) requiring the trial court to make a separate finding of facts, does not have any effect upon the power or duty of the appellate court in equity cases. Even in a law case unless the conclusions of law were correctly pronounced upon the facts found, the judgment must be reversed. But in equity cases, the appellate court will not be

bound by the chancellor's finding of facts, but will review the whole evidence and pronounce the proper judgment.

3. **Deed of Gift:** UNDUE INFLUENCE: CONFIDENTIAL RELATION: BURDEN: WAIVER. It is too late on appeal to claim for the first time that because the grantor in a deed of gift is the mother of the grantee, who lived with her, therefore a confidential relation existed between them which shifts the burden of proof upon such grantee to show there was no undue influence exerted by her over her mother to make the deed.

4. ———: INCAPACITY: EVIDENCE. The facts of this case are reviewed and are held to furnish no basis for holding that the maker of a deed of gift to certain of her children, to the exclusion of the children of a favored deceased son, was incapacitated to make the same.

Appeal from Buchanan Circuit Court.—*Hon. W. K. James,* Judge.

REVERSED AND BILL DISMISSED.

*Huston & Brewster* for appellant.

(1) The owner of property, mentally capable and of his own will and act as an incident to ownership, may exercise absolute dominion in the disposition of such property. He may give it away to charity or to strangers, to the exclusion of relatives or he may prefer one relative to another of equal grade and no one, except creditors, can question the transaction. To destroy this right of absolute dominion, the petition in this case avers two grounds: first, that at the time the conveyances were made, Elizabeth Fitzpatrick was mentally incapable of making them; second, that they were the product of undue influence and not her own act. The law presumes sanity and free action. Then in order to recover, it was absolutely necessary that plaintiffs should establish, and that, too, by the greater weight of the testimony, one or the other of the two allegations. (2) The evidence offered on the issue of mental incapacity not only failed to establish mental inca-

pacity, but affirmatively and beyond a reasonable doubt even established mental capacity in Elizabeth Fitzpatrick at the time the conveyances were made. The test is: "Did the grantor at the time understand the nature and effect of the transaction?" Cutler v. Zollinger, 117 Mo. 92; Likens v. Likens, 122 Mo. 279; McKissock v. Groom, 148 Mo. 459; McKinney v. Hensley, 74 Mo. 326; Richardson v. Smart, 65 Mo. App. 14. (3) Upon the finding of fact, the court erred in its conclusion of law therefrom, viz., that the execution of the deeds was procured by the undue influence of the defendant. Not all influence is undue; that which arises from love and affection and from acts of kindness is not undue, nor is that which arises from the relation of parent and child undue. To be undue it must be an influence exerted *mala fide* and it must be such "as amounts to overpersuasion, coercion or force, destroying the free agency and will-power of the grantor." And none of the facts found, either singly or in any possible combination, afford any just ground for an inference that undue influence ever existed or that, if it ever did exist, it was exerted. Berberet v. Berberet, 131 Mo. 411; Tibbe v. Kamp, 154 Mo. 545; Doherty v. Gilmore, 136 Mo. 419; McFadin v. Catron, 138 Mo. 218; Riley v. Sherwood, 144 Mo. 366; DeFoe v. DeFoe, 144 Mo. 458; Sehr v. Lindemann, 153 Mo. 276; Aylward v. Briggs, 145 Mo. 605.

*Grant S. Watkins* for respondents.

(1) Undue influence is presumed and the burden of proof shifts where the relation of confidence and trust alone, or confidential relations, such as parent and child, are shown to exist, or if the party acting be of weak mind, and there is either no consideration or a very inadequate one. In all such cases a presumption against the validity of the transaction arises. Ennis v. Burnham, 159 Mo. 519; Dingman v. Romine, 141 Mo. 475; Rice on Evidence, pp. 955, 966, 1089, 1091

and 1093; Gay v. Gillilan, 92 Mo. 264; Hamilton v. Armstrong, 120 Mo. 615; Street v. Gross, 62 Mo. 229; Martin v. Baker, 135 Mo. 503; 2 White and Tudors Leading Cases in Eq., p. 1156; Hegney v. Head, 126 Mo. 629; Yosti v. Laughran, 49 Mo. 599; Ford v. Hennessey, 70 Mo. 587; McClure v. Lewis, 72 Mo. 320; Story on Equity, secs. 309-315.    (2) "Where one person has acquired over another a position of superior influence or advantage by reason of relationship, trust or confidence (whatever its origin), and business dealings occur between such parties, the court will require proof of the former that the dealings were fair and honest in all respects on his part under·penalty of rescinding such dealings entirely." Ennis v. Burnham, supra; Martin v. Baker, supra; Kirschner v. Kirschner, 113 Mo. 297; Gay v. Gillilan, supra; Dingman v. Romine, supra; Hegney v. Head, supra; Rice on Evidence, pp. 955, 966, 1089, 1091, 1093; Tibbe v. Kamp, 154 Mo. 580; Street v. Gross, supra.    (3) The undue influence exercised in making a will is not a standard for testing that influence in making a contract between the living.   In making a contract the mind and will-power of one .party necessarily come into contact with those of the other and must be in condition to act independently.   In order to make a contract there must be two minds, each acting for itself. Ennis v. Burnham, 159 Mo. 495; Martin v. Baker, 135 Mo. 504.    (4) Ordinarily this court will defer to the finding of fact, in equity cases, by the trial court, especially where the case was tried in that court on oral testimony, as was the fact in this case.   Benn v. Pritchett, 163 Mo. 573; Taliaferro v. Evans, 160 Mo. 390.

MARSHALL, J.—This is a bill in equity to set aside a deed from Elizabeth Fitzpatrick to her daughter, Elizabeth A. Weber, dated January 23, 1896, conveying the south half of lots 22 and 23 of block 62, Smith's addition, to St. Joseph. A similar suit by the plaintiffs against Matthew Fitzpatrick,

is pending, to set aside a deed from his mother to him, of the same date, conveying the north half of the said lots. The two suits were tried together, and the decision on appeal in this case, by agreement, is to settle the other case also.

Elizabeth Fitzpatrick owned the said lots and lived thereon for many years. Her oldest son, William, had gone West, more than twenty years before these deeds were made, and had never been heard from since. Her second son, James, was a plumber, and before his marriage in 1888 he lived at home, with his mother, his brother, Matthew, and his sister, Mrs. Weber, who was a widow with two daughters. Until about six months before his marriage, James gave his mother practically all he earned. After that he gave her nothing because he had all he could do to take care of his family. Matthew appears to have been dissipated, and about 1890 he also married and moved away from the home of his mother. Mrs. Fitzpatrick and her daughter Mrs. Weber and her two daughters continued thereafter to live together. Mrs. Fitzpatrick had some revenue, arising from another piece of prop- erty in which she had a life interest, and Mrs. Weber earned money by nursing the sick, and with the joint revenue thus obtained, these women lived together until Mrs. Fitzpatrick's death. On January 9, 1896, James Fitzpatrick died, leaving a widow, Anna, and two children, William, aged six years, and Georgia, aged about one year, and they are the plaintiffs in this case. On January 23, 1896, Mrs. Fitzpatrick made the deeds in question, giving the south half of the two lots to Mrs. Weber and the north half to Matthew. By the terms of said deeds, however, Mrs. Fitzpatrick reserved a life interest therein to herself. Thereafter she and Mrs. Weber and her daughters continued to live on the property just as before. On August 1, 1898, Mrs. Fitzpatrick died. Thereupon Mrs. Anna Fitzpatrick, widow of James, at some date not disclosed by the abstract of the record before us, instituted this suit in the names of her children, William and Georgia, by herself

as next friend.   The ground upon which the aid of equity is invoked is thus stated in the petition:

"That at the time of the pretended execution of said instrument the said Elizabeth Fitzpatrick was old and infirm and was of unsound mind and memory and on account of her infirmities both mental and physical was not capable of executing a valid conveyance and was under the control and influence and power of the defendant and her brother, Matthew Fitzpatrick, and said pretended deed was not the deed of said Elizabeth Fitzpatrick and was without any consideration and was a fraud upon the rights of the other descendants of said Elizabeth Fitzpatrick and was made in pursuance of a conspiracy entered into between the defendant and her brother Matthew Fitzpatrick to overreach the said Elizabeth Fitzpatrick and to defraud these plaintiffs out of their share of said property."

At the trial, "the defendant objected to any testimony as to any alleged undue influence, upon the ground that it was not charged in the petition."   Thereupon the plaintiffs asked and the court gave them leave to amend their petition by interlineation by inserting the word "undue" before the word "influence" and adding the words, "and such influence and control was exerted by them to procure the signing of the deed hereinafter referred to."

Thereupon the plaintiffs introduced all their evidence, the defendant then introduced all of her evidence, and the plaintiffs offered evidence in rebuttal.   No question was raised or suggested as to where the burden of proof rested in the first instance.   The plaintiffs' testimony tended to show the state of feeling that existed between Mrs. Fitzpatrick and her son James and his family, the condition of her health, the effect his death had on her, the circumstances under which the deeds were executed, her condition of mind and body, and her relations and feelings towards her other children.   But there was not a word of testimony introduced by either side that

showed that the slightest undue influence had been exercised by Mrs. Weber or Matthew Fitzpatrick over the mother to compel her or induce her to execute the deeds.    In fact it is not now contended by the plaintiffs that there was any such evidence in the case.    On the contrary, the plaintiffs say: "The principal question in this case is one of the burden of proof."    They then contend that the burden of proof was upon the defendant, because of the "confidential relation"—that of parent and child—that existed between Mrs. Fitzpatrick and Mrs. Weber, and then say:

"Appellant made no effort to show the condition of body and mind of Mrs. Elizabeth Fitzpatrick at the time of the making of the deeds, but contented herself with general testimony, referring to the kind of woman Mrs. Fitzpatrick had been throughout her life up to a short time before the transaction in question. And this is true, although, notwithstanding the fact that Mrs. Weber herself was disqualified as a witness by reason of the death of Elizabeth Fitzpatrick, Mrs. Weber's two daughters, who were at the time of the trial sixteen and twenty years old, respectively, and had lived constantly in the family with Elizabeth Fitzpatrick, were present in the court-room at the trial, but were not put upon the stand by their mother. Respondents' witnesses, however, show that the old lady was infirm and sick for some time before and after the death of James, that she had the rheumatism and was feeble, and was furthermore prostrated by the last sickness and death of James, and at the time of the funeral was taken with a stroke of paralysis, which was the third stroke of paralysis with which she had been attacked; that she was unable on that account to attend the funeral and that she was attended constantly up to the night of the twentieth of January, on account of this sickness, by her daughter-in-law, Annie Fitzpatrick, and the deeds were made only three days after this.    The testimony also shows that at this time she was grieving very much on account of the death of her son."

The case was tried, taken under advisement, and thereafter on January 22, 1900, at the request of the parties, the court filed the following finding of facts and conclusions of law:

### Finding of Fact.

"1.   From the evidence the court finds that Elizabeth Fitzpatrick was the owner of lots number twenty-two and twenty-three, in block number sixty-two, Smith's addition to the city of St. Joseph, Buchanan county, Missouri, and for many years was the widowed mother of three children: Elizabeth A. Weber, defendant in this suit; Matthew Fitzpatrick defendant in a similar suit of these plaintiffs, pending in this court, and James Fitzpatrick.

"2.   That this property was and is worth $2,000 to $2,500.

"3.   That for many years prior to his marriage, James gave to his mother all the wages he earned and was her main source of support; the other children, Elizabeth and Matthew, having married and lived separate from their mother.

"4.   That James had two children, William and Georgia, now ten and eight years of age, respectively, who are plaintiffs herein.

"5.   That Elizabeth Fitzpatrick was very fond of these grandchildren, William and Georgia, and especially devoted to William and greatly interested that he should be educated. She repeatedly spoke about his education and that his interest in her estate would be sufficient for that purpose.

"6.   That James was very poor and died January 8, 1896, leaving substantially no property, and was buried at the expense of his mother and others.

"7.   That the mother was about seventy years old when James died, and becoming feeble. She was deeply affected by his death and her nervous system greatly shocked. The

witnesses testify to her having fainting spells and their working sometime to 'bring her to.'

"8. That she had been independent-minded and generally controlled the affairs of her household but latterly manifested childishness by such as crying over very trivial matters.

"9. That she had lived for the last few years and died with her daughter, the defendant, who appears to have robust health and strong will.

"10. That on January 23, 1896, fifteen days after James's death, the defendant and her mother went to the office of an attorney, who knew, but was not intimate with the parties, and defendant stated to the attorney that her mother wanted to make a deed to her property to the defendant herein, and to her brother, Matthew Fitzpatrick, defendant in the other suit. As first proposed it was to be an absolute conveyance. The attorney suggested that it would be better for the mother to reserve a life estate interest in this property. To this the mother made no objection and the deeds were drawn accordingly, one deed to the defendant for the south half of said two lots, and the other deed to the north half thereof. Each deed mentioned a consideration of $25, but in fact there was no valuable consideration. They were explained to and executed by her. The defendant was all the time present. The attorney's services in the matter were gratuitous.

"11. That this property was substantially all that the mother had.

"12. That the mother died August 1, 1898, leaving the defendants in these two suits and the plaintiffs therein her only heirs."

Conclusion of Law.

"From the facts in the case as hereinbefore found, the court finds that the execution of the above-mentioned deeds

was procured by the undue influence of defendant and was not the free and voluntary act of Elizabeth Fitzpatrick, deceased, and that plaintiffs are therefore entitled to have said deeds set aside and held for naught."

The plaintiffs did not object or except to the findings of fact, nor take any steps looking to a correction of any claimed error therein. The defendant filed a motion for new trial and in arrest, in which it was claimed that the findings of fact were not supported by any evidence in the case and that the conclusions of law did not properly follow from the facts found, and insisted at all proper stages of the trial that the plaintiffs were not entitled to recover.

These motions being overruled, the defendant appealed.

## I.

The finding of facts by the trial court does not show any incapacity of Mrs. Fitzpatrick to make the deeds nor the slightest undue influence exercised over her by Mrs. Weber or by Matthew Fitzpatrick, and if the fullest force and effect be given to everything the plaintiffs contend that they showed, there is still not the slightest evidence of incapacity or undue influence in the case. In fact, the plaintiffs say that the defendant "made no effort to show the condition of body and mind of Mrs. Elizabeth Fitzpatrick at the time of the making of the deeds, but contented herself with general testimony referring to the kind of woman Mrs. Fitzpatrick had been throughout her life up to a short time before the transaction in question," and then say that while Mrs. Weber was incompetent as a witness, still her two daughters, aged at the time of the trial sixteen and twenty years, were present in court and were not called as witnesses. The plaintiffs then say that they showed that Mrs. Fitzpatrick was infirm and sick for sometime before and after James's death; that she had rheumatism and was feeble; that she was pros-

trated by the sickness and death of James; that she had a stroke of paralysis at the time of the funeral, which was a third stroke; that she was unable to attend the funeral and was sick and attended by her daughter-in-law, the plaintiffs' mother, until January 20, 1896; that the deed was made three days afterwards, and that she was then grieving very much on account of the death of her son.

But all this taken in connection with the finding of facts, or taken by itself, and considered separately or collectively, does not show the incapacity of Mrs. Fitzpatrick to make the deed, nor does it even tend to show that any undue influence was exercised over her by Mrs. Weber or by any one else. The court does not find any facts which furnish any support for the conclusion of law drawn by it, that the deed was procured by the undue influence of the defendant and was not the free and voluntary act of Mrs. Fitzpatrick. And if the circuit court had found any fact that would give support to such conclusion, this court would not have been bound by that finding, and would review the evidence and render the proper judgment in the case notwithstanding the judgment or the finding of facts by the trial court, because this is a proceeding in equity, and section 695, Revised Statutes 1899, requiring the trial court to make a separate finding of facts, was not intended to have and did not have any effect upon the power or duty of this court in equity cases. [Blount v. Spratt, 113 Mo. 48; Lins v. Lenhardt, 127 Mo. 281.] In actions at law, such finding of facts is treated as a special verdict; and an appellate court will not review the finding if there is any substantial evidence to support it. [Freeman v. Moffitt, 119 Mo. l. c. 294; Land Co. v. Bretz, 125 Mo. l. c. 423.] But in all cases "unless the conclusions of law, upon the facts found, were correctly pronounced, the judgment must be reversed." [Land Co. v. Bretz, 125 Mo. l. c. 423.] Upon the facts found, the conclusions of law in this case, were not correctly pronounced, and therefore the

judgment can not stand. But this being an equity case and the findings of fact by the trial court not being binding upon this court, nor treated by it as a special verdict, but the whole case being open to review here, it is necessary to consider what was really shown by the parties in the trial of this case.

As before stated, there is not a word of evidence in the case that gives substantial support to the charge that Mrs. Fitzpatrick was incapable to make a deed, and there is not even an attempt made to show any undue influence. At the trial the defendant objected to any evidence as to undue influence because no undue influence was charged in the petition. Thereupon the court permitted the plaintiffs to amend by interlineation so as to charge undue influence exerted by defendant. But notwithstanding this was so pointedly called to the plaintiff's attention, they made no effort to prove undue influence and offered no proof whatever thereof. Neither did they then contend nor claim that the burden of proof was on the defendant to show that there was no undue influence exerted over her. On the contrary, the plaintiffs, having made the charges of incapacity and undue influence, proceeded with the trial of the case without raising any question as to the burden of proof, introduced all their evidence, and the defendants did likewise, as did also the plaintiffs in rebuttal, and so far as can be seen by this record no question as to the burden of proof was raised in the trial court. It is now too late to claim for the first time in this court that because Mrs. Fitzpatrick, the grantor, was the mother of Mrs. Weber, the grantee, therefore a *confidential* relation existed between them which shifts the burden of proof upon Mrs. Weber to show that there was no undue influence exerted by her or any one else over her mother to make the deed.

But even, if this was not so, the facts disclosed by this record show very clearly that although Mrs. Fitzpatrick was about sixty-seven years old when James died, and although his death grieved her very much and brought on a fainting

or bad spell (the plaintiffs say it was a third stroke of par-
alysis, but this could hardly be true as she recovered and lived
over two years afterwards and there is, no evidence that she
was even partially paralyzed during those two years), and
that she was unable to attend his funeral, and although she
had rheumatism, and although she is shown to have cried
when her grandchildren, the plaintiffs, brought some candy
to her house and did not offer her any, and although she is
shown to have been hurt when her daughter-in-law came from
down town with a bundle and did not show her what was in
it, still she was of sound mind, she knew what property she
owned and who were the natural objects of her bounty, she
was not overpersuaded, coerced or her free agency or will-
power destroyed, the property was hers to do with it what
she would, and therefore no court has any right to undo what
she did with her property.

The incidents and facts and opinions shown and relied
on by the plaintiffs are as follows:

FIRST.   That Mrs. Fitzpatrick liked her grandson, Wil-
lie, the plaintiff, better than she did all her other grandchil-
dren, and that on one occasion when he had been visiting her
with Mrs. Anna Fitzpatrick and had left the house, and had
started home he remarked that "he had not kissed grandma
good-bye," and that his mother told him to run back and do
so which he did, and that in leaving he slammed the door and
upon being reproved by one of Mrs. Weber's daughters there-
for, Mrs. Fitzpatrick said she "wanted Willie to slam the door
as much as he pleased."   And further that after James's
death she said she wanted Willie educated, and when his
mother said she could not do so, because she ·hadn't money
enough, Mrs. Fitzpatrick said: "You don't need money; there
will be a thousand dollars or more coming out of the place for
the children and I want you to promise that you will educate
them."   This is the testimony of Mrs. Anna Fitzpatrick the
mother of the plaintiffs.   It must be remembered that Mrs.

Elizabeth Fitzpatrick, the other party to this talk, was dead; and that when Mrs. Weber undertook to testify the plaintiffs objected to her competency and she was not permitted to testify. This same witness testified that Mrs. Weber told her on April 9, 1899, which was nine months after her mother's death and over three years after the deed in question was made, that her mother said that James's children should not have anything; that if the other grandchildren could not get anything, James's children should not have anything either, that "the old lady got very mad that day" (the day is nowhere specified) "and she [Mrs. Weber] said she had lots of trouble with ma, and one day ma got so mad at me [Mrs. Weber] for pulling down the curtain, and ma got so mad I [Mrs. Weber] had to hold her in bed and stick a towel in her mouth to keep her from screaming. Miss Marie Weber, her daughter; was present when she said it." And plaintiffs say Miss Marie Weber was present in court at the trial and was not even called to contradict this statement. The candy incident and the package incident and the towel episode are testified to by Mrs. Anna Fitzpatrick in answer to the question: "State how she was as to being childish?" Concede that all these things are strictly true, it is not sufficient evidence upon which to set aside the deed. For it is not shown at what time these things took place, whether before or after the deed was executed, and without regard to when they took place they do not constitute any substantial evidence of her incapacity to make the deed, nor of any undue influence being exerted over her. And when they are considered in connection with the testimony adduced by the defendant, there should be no difference of opinion about the case. The defendant showed, first, that when James was sick, the boy, Willie, was making a noise and Mrs. Elizabeth Fitzpatrick told him to stop, that his father might die, and he said he did not care, that if he did his mother would soon get him a good father, and that Mrs. Fitzpatrick was very angry about it, and said the child would

not have said it if he had not heard others say it, and that if James died she would not give a dollar of her money to his widow or any of her children; that she "had to work for her children and Anna had to work for hers."

Second. The plaintiffs showed by Mrs. Estella Fitzpatrick, that she thought Mrs. Elizabeth Fitzpatrick was "childish." But this same witness said that she had only seen her "once in a while" during the last two years of her life, "and she seemed to be all right when I spoke to her; seemed like a sensible woman." On the other hand, the plaintiffs' witness Mrs. ——— Fitzgerald said that after James's death she visited his mother and she was smoking her pipe and said, "James is dead and buried; we buried James: I paid half of the funeral expenses and Matt the other half;" that these expenses were from $110 to $115; and that she then added, "That is all I can do for them now." The daughter-in-law Anna, the mother of the plaintiffs, does not say she was childish or incapable, but confines herself to the statement that, "Sometimes when you would ask her about things she would not know anything about that any more, and at other times she would know something about that." None of the other witnesses called by plaintiff say anything about her mental condition. They testify as to her state of feeling towards the plaintiffs, and as to the "spell" she had when James died. But Charles F. Strop, the attorney who wrote the deeds, testified that she understood perfectly what she was doing when she made the deeds, and Dr. W. B. Davis, her physician who treated her in January, 1896, the same month in which the deed was made, testified that: "I did not consider her out of her mind at all. I think her mind was as good as the average person's of her age at the time I saw her;" and that he did not see any indication that she was childish, but that on the contrary she was positive and rather wanted to have her own way. These witnesses were called by the plaintiffs. On the other hand, the witnesses for the defend-

.ant testified that "she was a woman that always looked ahead; she could not be easily influenced; she was a woman that had her own will and mind; she was a strong-minded woman;" that she was "an extremely strong-willed woman, competent of her own power to attend to her own affairs, more so than most other women;" that "she was the controlling spirit in the household," and that Mrs. Weber yielded to her even to the extent that Mrs. Fitzpatrick would decide what purchases Mrs. Weber should make for herself; and further that, "she was a woman that was very difficult to influence; she had her own opinions and held to them."

Without regard to where the burden of proof rests in such cases, the evidence in this case, adduced by both parties, completely dispels and disproves the allegations of incapacity and undue influence contained in the petition. For these reasons the judgment of the circuit court is reversed and the bill is dismissed. All concur.